Turley, J.
delivered the opinion of the court.
This case presents to our consideration, another of those afflicting tragedies, which unfortunately are but too common, resulting from the gratification of loose and vicious propensities, regardless of social and moral duty. A husband forgetful of *482 the sacred obligations of his marriage vow, forgetful of the legal and holy rights of his neighbor, by which the purity of his daughter should have been protected from his lawless passion, has in an evil hour, brought desolation upon his own house, and death into that of another. A man advanced in life, with a wife, with whom he had lived, until she had presented him with grand children, when it would be reasonable to suppose, that the fiery passions, which so often lead astray, had been calmed and brought under proper control, has nevertheless, as there is but too much reason to believe, corrupted the daughter of his near neighbor, and lived with her in adultery for years.
The consequences of this great crime are horrid to think of; they have ended in the death of his paramour, by the hands of his own wife; and in her conviction of the crime of murder, and, a sentence to confinement in the Penitentiary of the State fora period of ten years; a period, very probably equal to the extent of the remainder of her life. This poor woman, who from all the proof in the record, has obviously been “more sinned against than sinning,” and upon whose head this calamity has fallen, a calamity more fearful if possible in its consequences to her, than that, which befell her misguided and unhappy rival, has appealed to this court as her last resort, for the purpose of ascertaining, whether she cannot be released from it.
We do not deem it necessary to disguise that our sympathies are enlisted in her favor; and, that we have examined this record, with the view of ascertaining, if there were any legal grounds, upon which we could be justified in giving her a new trial, and with an anxious desire, that they might be found. But at the same time, we deem it proper to observe, that in coming to the conclusion we have, we are not sensible that our sympathies misled our judgment, or biassed our decison.
It is true, that in scrutinising the charge of the Judge, we have been able to find no legal error therein; yet, we cannot entirely divest ourselves of the belief, that if he had been a little more particular in applying the legal distinctions, which he has correctly drawn, to the particular facts of the case, the result, *483 might haye been different. But, be that as it may, there is no error in this, for which, we can reverse.
The consequence of this is, that if we grant a new trial, it must be upon a careful examination of the proof adduced, and a deliberate conviction, that it is not of a character to justify the verdict which has been returned by the jury.
We have said heretofore, that the rule established by this court in relation to granting new trials in civil cases, for defect of proof, does not apply to criminal cases; but that in such, we will scrutinize and weigh the evidence, and if in our judgment^ it preponderate against the verdict, we will grant a new trial.
This scrutiny, then, it becomes our duty, now to make in the case under consideration. We do not deem it necessary to enter into an investigation, to show, that an illicit intercourse has existed for a long time between the husband of the prisoner and the deceased, it has not been controverted on the part of the State, indeed, it could not be, for the proof of the existence of the fact, is of such a character, as leaves it almost beyond doubt.
But it becomes highly important to investigate with care 1st, the effect which this intercouse, notorious as it was, produced upon the feelings, and vindictive passions of the prisoner and the deceased towards one another; and 2d, the mode and manner, in which these feelings and passions were brought to bear, in producing the catastrophe so much to be deplored.
From a careful examination of the proof, upon these two points, we think we shall be enabled to judge, whether the verdict of murder, in the second degree, which was found by the jury, against the prisoner, can be sustained. Then 1st, as to the effect produced uppn the feelings and vindictive passions of the prisoner and the deceased. The prisoner appears to have been nearly distracted by the infidelity of her husband, and having no positive proof of his guilt, seems to have spent much of her time in anxious watchings about the house of the father of the deceased, for the purpose of obtaining such proof, if practicable.
John F. Sevier, a witness on behalf of the State, says, that in the month of September, previous to the killing, he was *484 passing by the house of the father of the deceased, about two hundred yards from the house, and saw the prisoner in the corner of the fence; she saw him, and jumped over the fence and went in the direction of the house.
Bedy Mansfield, another witness for the State, says, that about two years before the trial, she was passing by the house of Dougherty, the father of the deceased, and saw the prisoner lying in the weeds, about one hundred and fifty yards from the house; that she saw the 'prisoner, at another time, stepping about in the woods near the same distance from the house; and about the same length of time.
Martha Mansfield, another witness for the State, says, that about three years before the trial, she on two occasions saw the prisoner about Dougherty’s place, and that she told her she could see her round Dougherty’s almost any time.
Orleana Mansfield, a witness for the State, says, she saw the prisoner four times near the house of Dougherty, concealed; saw the prisoner once in the Maple Swamp, between Dough-erty’s and Cash’s, on the road to Livingston with an axe; she asked the witness if the deceased was going to town; said she would kill her. This was more than a year before the killing took place. Witness, also, says, she saw the prisoner once in Dougherty’s chimney corner, once at Dougherty’s barn, once in a chestnut stump, which was hollow, about two hundred yards from Dougherty’s house, and in sight thereof; once in the lot, close to the house, lying in the weeds, and that upon being discovered she ran. These circumstances were also at periods of more than a year before the killing. •
Maria Eldridge, a witness for the State, says, that about eighteen months before the trial, she heard the prisoner say, that if ever the deceased put her hands upon her, she would kill her.
Thompson Cash, a witness for the prisoner, says, she had talked to him about her situation and troubles; that he had advised her to bear it, and say nothing; that some time in the summer before the trial, she agreed with him, that, for peace, she would bear it all in future; that if they would let her alone at home she would bear it and have peace.
*485 Thomas K. Harris, a witness for defendant, says, that some time in the summer, before the trial, he had a talk with the prisoner; she spoke of the threats made against her by the deceased; she seemed to be in much distress, and said, she understood her life was to be taken, and she seemed to be alarmed on account of the threats.
Henry Carlisle, a witness for the prisoner, says, he has been with Copeland, the prisoner’s husband for ten years, and that he never heard her make any threats against the deceased.
This is all the proof in the record, tending to show the state of mind, of the prisoner in relation to the deceased, produced by her wrongs. And what does it amount to? That (as has been observed) she spent much time in watching the house of the deceased, but for what purpose? It has been argued here, and no doubt was so before the jury, that she was lying in wait for the purpose of assassinating the deceased. Can it be possible, in the nature of things, that such was her design? Surely not. If she had desired to murder the deceased, there could have been no difficulty in finding her at any time; they lived near together, and no doubt could, and did meet often. Where the sense of lying in wait about the fences, in the weeds, in a stump, in the chimney corner, if her design was to assassinate her? These lyings in wait were in open day light, liable at all times to detection; in fact they were, as it appears, always detected, and, moreover, how was she to perpetrate the imagined design; when, from all that appears, she was on every occasion, but one, unprepared to commit the deed, that is unarmed? People who lie in wait to commit murder, most generally have fire arms for the purpose, they being the weapons most effectual for committing clandestine murder. But what was the occasion, when she appears to have a deadly weapon? It was, when she was found in a Maple swamp with an axe, and enquired if the deceased was going to town, and said that she wanted to kill her — a poor weapon for a woman to use in perpetrating a murder in day light, and upon a young and vigorous woman, prepared for her defence.
But is it possible, if such had been her design, she would have informed the witness of it? Indeed, from the circum *486 stances, we think, that at the time she was found in the swamp she was not watching the deceased, because the swamp was two hundred yards from the house of deceased, and nearer her own; and, because, here she met the witness boldly, and upon all other occasions, upon being discovered, she skulked. What was the reason of this? Though compelled by the irresistible impulses of her jealousy, to watch the house of her rival, with the view of detecting her husband, yet she was ashamed of it, and whenever caught, sought to conceal herself; but when found in the swamp, being engaged in a different business, probably getting maple bark for the purpose of dying, (which will explain satisfactorily how she came to have the axe,) she felt no shame, and did not seek to conceal herself.
Then, in our opinion, all this clandestine watching of the house, where the deceased resided, is no evidence whatever that she was seeking or desired an opportunity to kill her, but only an opportunity of detecting her husband in his infidelity, and that malice prepense against the deceased, is not to be inferred therefrom.
But she said on one occasion, near eighteen months before the affray, that if ever the deceased put her hands upon her she would kill her; and on another occasion, as we have seen, that she wanted to kill her. This is the only portion of the proof that goes to show direct malice, and it is worth but little in establishing its existence, because the statements were made a long time before the killing took place, and the law will not presume a killing to have been perpetrated upon ancient threats and grudges, if there be any thing more immediate, upon which it can be predicated, which, we think, will appear in the further investigation of this case; and because these threats are of avague and uncertain character, one being based upon a supposed personal injury; the other a mere ebullition oí feeling, the result of unmerited suffering. So much for the effect produced upon the feelings and passions of the prisoner, by the illicit intercourse of her husband and the deceased.
Let us now see, what these effects were, upon the deceased. Her rancour against the prisoner appears to have been very *487 great, induced no doubt by the publicity which liad been given to her intercourse with the prisoner’s husband, and mainly, as is fairly to be presumed by her clamors.
Isaac Williams, a witness for the defence, says, he saw the deceased have a knife which she showed him, and heard her say she would beat the prisoner.
Polly Allen, a witness for the defence, says the deceased offered her a dress, if she would get the prisoner out, that she might kill her, which she refused. She then offered to let her have things in the store, which she refused.
Sally Nelson, a witness for'the defence, says the deceased showed her the dress she offered to Polly Allen, to get prisoner out for her, and said, she would freely have given it.
Sally Allen, a witness for the defence, says the deceased showed her a dress which she has offered to Polly Allen, to get prisoner out, that she might kill her, and said she would have freely given it. She further says, that the deceased came to her house, seemed to be excited, had been crying. Witness asked her what was the matter? She made no answer, but went through the house into the kitchen, and came out immediately with a flesh fork in her hand, and went towards Copeland’s. She further says, that on Wednesday or Thursday before the fatal rencontre between the prisoner and the deceased, the deceased came to her house, and told her she was going to Kentucky, but that she would not leave satisfied, until she gave the prisoner a beating, and that if witness would get her out for her, she would give her a dress. Witness refused; she then offered her a red merino dress, and if that would not do, she would give her ten pounds of coffee.
Isaac Allen, a witness for the defence, says, that some time in the Spring before the trial of this case, the deceased came by where he was at work, and said she had been at his house a few days before, that she thought he had a carving knife, but that she could find nothing but these damned old flesh forks, that her nephew had given her a knife and pistol, and that she did not know what made her such a fool, as to be without them that day, that she had carried them to kill the defendant, and had not been without them before then -in a long time.
*488 Stephen Dillon, a witness for the defence, says, that about a year before the trial, the deceased showed him a knife, and said she had it, to cut Mary Copeland to pieces.
Thomas Cash, whose testimony has already been adverted to, further says that he heard the deceased say, that she got a pair of flesh forks from Isaac Allen’s, and followed the prisoner, and would have killed her, but was prevented. He also says that the deceased told him, she could make Copeland whip the prisoner, his wife, when she pleased, that some few days afterwards he saw the deceased going to town, and a while after, he saw Copeland coming from town — that they must have met, and that on that night, the prisoner came to his house, and said she had been whipped by Copeland, her husband, and driven.from home, and asked to be permitted to stay all night.
This is all the material testimony, going to show the nature of the feelings and passions of the deceased towards the prisoner, previous to the rencontre, which terminated in her death. And what does it establish? a degree of hatred and malignity, that one unacquainted with human nature, could scarcely conceive should exist in the breast of a wrong-doer, towards the wronged. It establishes beyond a doubt, a determined and wicked propensity to do the prisoner great mischief at least, if not to murder her, of long continuance, and extending down to the moment of the fatal affray. It shows that she followed her on one occasion, v/ith a deadly weapon to kill her, which she says, she would have done, if she had not been prevented. She regretted that on that particular she was without weapons, of a more deadly character, which she had been in the habit of carrying, and had not for a long time before, been without. It shows that such was her thirst for vengeance, that she offered bribes to different persons to get the prisoner out, so that she might beat or kill her. It shows that so strong was the feeling, that she could not leave the State for Kentucky, where she was going, in peace, without its gratification: and last, but not least, it shows that she could even resort to the influence she had obtained over her guilty paramour, to cause him to inflict personal violence on his helpless wife, and drive her from his *489 door in the night time, and compel her to seek refuge at a neighbors.
What a different state of mind from that of the prisoner— the one infuriated at the publicity which had been given to her guilty intercourse with Copeland, the other distracted, at the destruction of her domestic felicity, by the infidelity of her husband; the one, watching with greedy anxiety for the means of avenging herself upon her adversary, either by killing her, or inflicting upon her great bodily harm, the other watching with patient endurance, for the evidence of her husband’s guilt; the one, breathing upon all occasions, the most horrid threats of vengeance; the other, only heard upon two remote occasions, to express a wish to kill her, and a threat that she would, if she even laid her hands upon her; the one continuing her desire for revenge, and so expressing it, up to the very morning of the fatal 'rencontre; the other, abandoning all such wishes months before, and expressing herself in meekness, willing to bear all things, provided she could be left in peace at home.
It may well be asked, how it is possible, that so different a state of mind could exist, in the injurer, and the injured? It is only to be answered by saying that such is the strange anomoly of the human character, that it is oftentimes found easier to forgive those who have trespassed against us, than those against whom we have trespassed; and that the proof shows that the prisoner was a member of the Christian Church, in which she had been taught that it was a holy duty to forgive those who wrong us.
This difference in the feelings of the prisoner and the deceased, which we are satisfied, the proof warrants us in drawing, must be borne in mind, as it is all important for the proper understanding of the second proposition to be discussed, and the unravelling the somewhat contradictory and confused evidence in relation thereto.
2. In what manner and mode were the feelings and passions of the prisoner and the deceased brought to bear in producing the catastrophe, which ended in the death of the deceased? The investigation of this proposition, includes the transactions of the day on which the deceased was killed.
*490 Thompson Cash, a witness whose testimony has been before referred to, says, that on the Sunday before the fatal rencontre, he saw the prisoner, and that she had promised to go to preaching in the town of Livingston on that day, that she was to come to his house; that to go to Livingston, she was boundto come the way she did, or go the main road along by Dougherty’s, and says, the way the prisoner went is further than to have gone the road immediately by Dougherty’s.
Ann Cash, a witness fo,r the defence, says, that the prisoner was to come by their house on the day,of the fight to go to Livingston to preaching.
Ferdinand Dougherty, a witness for the prosecution, says, he w^s at old man Dougherty’s, when the affair took place, was standing in the yard at the wood-pile with Alexander and Samuel Faris, that he saw the prisoner coming round the fence about the Celina road, that she went across towards Stuarts, that she was riot in the road, but going along in the woods— that SamuelFarris hallowed out to the deceased, saying, “Aunt Ruth, yonder goes old Mary Copeland;” Ruth was in the kitchen, she came out and started across the yard, and then turned down in the direction to intercept the prisoner. Prisoner went like she was going to Stuart’s fence towards Cash’s — deceased went on, did not see what she did with the stick — when deceased got within about five yards of the prisoner’s path, she stopped, prisoner went on, when she got to a log, about twenty steps from where they fought, she made a little halt, then went fast, until she got in about five steps of deceased, and then, sprang'across at her — they clinched, and he saw a grabbing of hands, prisoner got under the deceased’s right arm, and the deceased had her right arm round prisoner’s neck, and the prisoner struck like she was stabbing with her right hand; says that the deceased had no stick, that the distance from the house of Doughterty, from whence he witnessed the affray to the place where they fought, is one hundred and sixty yards, open woods, a few trees, and no under growth.
Alexander Farris, a witness for the prosecution, says, on the Monday morning the fight took place, he was in the yard on the wood-pile with Ferdinand and Samuel Farris, that he saw the *491 prisoner going round towards Stuart’s, that his aunt Ruth came out of the kitchen, went by the crib, got a stick and started over in the direction to intercept the prisoner, that the prisoner went on like she was going towards Stuart’s gate, got near the gate, and turned rather back and took down Stuart’s fence in the direction of Thompson Cash’s — that the deceased went on, and took a path that intersects prisoner’s path, between Stuart’s and Cash’s — that when deceased got within five steps of prisoner’s path she stopped, and the prisoner when she got to a log in about twenty steps of the junction of the paths, made a small halt, and then went fast, until she got opposite the deceased, and then sprang across at her, saw their hands grabbing, then saw prisoner get deceased with her left arm under her right arm, deceased’s right arm round prisoner’s neck, and then saw the prisoner strike like she was stabbing — heard a scream, and the deceased fell; says, that the distance from where he stood to the place of rencountre, was one hundred and sixty yards, open woods, and no under growth — that he saw no stick in the hands of the deceased, that he did not see what the deceased did with the stick she had taken with her from the crib.
Samuel Farris, a witness for the State, says, he was at his grand-father’s, on the Sunday morning the fight took place, that he saw the prisoner going round past his grand father’s, like she was going to Stuart’s; he said “aunt Ruth, yonder goes old Mrs. Copeland,” thinks she did not hear him, she came out of the kitchen, she went by the crib, and he saw her have a stick, going in the direction to intercept the prisoner. Her father told her to come back, she looked back but did not return. . When the deceased went through the yard, prisoner had passed Stuart’s gate, and was going down Stuart’s fence towards Thompson Cash’s, deceased went on through the yard out at the place where the fence was down, crossed the road, and took a path intersecting the prisoner’s path between Stuart’s and Cash’s; that the deceased and prisoner met between the junction of the two paths, that they both kept right on and met; that as they came near, prisoner increased her gate, that when they met, he saw a grabbing of hands, that the prisoner got her left arm round the deceased’s waist, deceased got her right arm round *492 prisoner’s neck, who then struck like she was stabbing; he heard a scream; the deceased fell.
Polly Farris, a witness for the State, and a sister of the deceased, says, she was at her father’s on the Sunday morning, the fight took place — that she ran down to the place w'here it occurred, and found her sister stabbed in several places, of which she very shortly died.
Matilda Dougherty, a sister of the deceased, and a witness for the State, proves in substance, the same as the foregoing witnesses.
Alexander Dougherty, the father of the deceased, says, he did not see the fight, saw Ruth pass from the kitchen by the house door, and go in the direction of the crib, then saw her go through the orchard towards where the fence was down, next the road with a stick, called to her to come back, she made him no answer; he says, that the stick produced, which was a large hickory about three and a half feet long, and three and one half inches or four in circumference, looks very much like, and it may be, one of the sticks he cut and put in the fence about, or near his crib, being in the same direction deceased went before he saw her with a stick; he further says, that the deceased was a woman of uncommon high temper, but a very affectionate child. 'This constitutes the proof the corpus delicti, on the part of the State.
On the part of the defence.
Wyatt Haywood, says, he heard Ferdinand Dougherty say, he had done his best to stop the deceased, but she would not— she said she would have satisfaction. Further says, that after the affray, he examined the prisoner and saw a cut on her head, and a bruise on her wrist.
William Dougherty, a nephew of the deceased, says, he found and picked up the stick, which was produced on the trial, and which is alluded to in Alexander Dougherty’s testimony, near where the fight took place — that he went after his aunt Ruth’s shoes, that he found one of them near her path, the other, between the junction of the two paths, nearest the defendant’s path — and that he found the stick between the shoes, close to the shoe, that was nearest the defendant’s path.
*493 Thompson Cash, says that he saw Alexander Farris on the road to Livingston, a very short time after the killing, and that he told him, that his aunt Ruth went out and commenced upon the prisoner with a stick, and, that the prisoner had stabbed and killed her. •
Rachel Orton, says, that she saw the prisoner soon after the homicide, that she had a large knot on the top of her head, as thick as her wrist, it was a long knot, seemed to have been made with a stick, and running across the head, defendant had a bruise also on her wrist, prisoner staid all night with her, next morning there were green streaks down the side of the head, and she complained that she could not turn her head.
Thomas R. Harris says, that the deceased was the largest woman, also the youngest; says also, that the defendant had a knot on her head, running cross it, as large as a hen egg, and that her wrist was bruised.
Jackson Thompson says, that he was at the place where the fight was said to have taken place, that old man Dougherty was standing in or near the path of the prisoner, some seven or eight steps above the junction of the paths, that he pointed his stick and said there Ruth lost her life. Witness looked and saw a drop of blood on a leaf, it was picked up by a boy — he further says, that Alexander Farris was present, and did not contradict it. This was soon after the killing, and before old man Dougherty left the ground. .
Harrison Copeland, says, that he heard the examination before the Justice of the Peace, and that Ferdinand Dougherty swore that Ruth and the prisoner came together.
Now it is obvious, that the question, as to whether this homicide be murder, manslaughter, or self-defence, depends materially upon the solution of the difficulty, arising from the proof as to the point at which the prisoner and the deceased met, and as to which commenced the assault.
In as much as Mrs. Copeland, the prisoner, was going her own road, and in a laudable pursuit, if she did nothing more, in going that road, than defending herself against a violent assault from a hickory stick, three and one half feet long, and from three and one half to four inches in circumference, the *494 killing in our opinion was homicide se defendenda. If she upon meeting her adversary unexpectedly, who had intercepted her upon her lawful road, and in her lawful pursuit, accepted the fight, when she might have avoided it by passing on, the provocation being sudden and unexpected, the law will not presume it to be upon the old grudge, but upon the first insult, by stopping heron her way, and it would be manslaughter.
If the deceased upon approaching the prisoner’s path, repented of her intention, or became irresolute, and stopped, leaving the prisoner full and unobstructed right and liberty to pass, and she brought on the attack with design to kill her, it would be murder in the first or second degree, according to the circum- • stances of the case, that is, if the killing was the result of the old grudge, and a previously premeditated malice, it would be murder in the first degree, if it were the result of malice suddenly produced by the sight of her rival, without previous premeditation, it would be murder in the second degree.
Then, in the first place, where did they meet? The proof shows most conclusively, that the prisoner was passing down a path by Stewart’s and Cash’s fence; that the deceased, upon being informed of the fact, left her father’s residence, and after arming herself with a deadly weapon, took a diagonal path intercepting that of the defendant, and with the view of intercepting her; what she designed by that interception, the testimony which we have heretofore examined, fully explains. It is unnecessary to repeat it, it was as she avowed again, and again, to kill her, or to beat her before she left for Kentucky. That this design was well known to her friends, is obvious from the fact, that they informed her that the prisoner was passing: the more discreet portion of her friends, to wit, her father, and her sister, requested her to return; to this prudent advice she turned a deaf ear. Going, then, upon such an errand, and with such motives, is it to be conceived, that she would suddenly change her fixed intentions and stop short of the point, where her long conceived vengeance was to be satiated. Upon what motive would she do this? Had her heart softened? Had she repented of her evil designs? No one pretends to this, and yet some of the witnesses say she did *495 stop five steps from the point where the two paths intersected, and that the prisoner brought on the attack. Is this probable? We think not. ■
Because, in the first place, we think that the proof shows, that the prisoner was, and had been for a considerable time before, anxious to avoid any conflict with her: from the period of time at which the witness Cash had advised her to bear her troubles with patience, and she had promised she would, we hear no more of her watching the house of the deceased; we hear no more of her threats, or complaints. On the morning of the catastrophe, in going to join her neighbor for the purpose of attending divine worship, instead of taking the direct road, which would have led her by the house of the deceased, she, obviously with the design to avoid collision, took a circuitous path. She had been heard to express fears, that she was to be assassinated by the deceased. The deceased was a stronger and a younger woman. Can it then be possible, that she would not have passed in peace, if she had been permitted to do so?
2. The character of the deceased; her embittered feelings towards the prisoner; the great length of time she had been seeking an opportunity to do her mischief; the fact, that she was going to Kentucky immediately, the consequence of which would be, that if she missed the then opportunity, it would probably be gone forever, preclude the idea of her having abandoned her intention. But in answer to this, it is said she stopped, because she saw the knife in the hands of the prisoner. This is not at all probable, if possible, because the proof shows, that she came upon the path of the prisoner considerably in advance of her, and that after the deceased had stopped, the prisoner continued to advance until she got within about twenty steps of deceased, and then made a pause. Is it, then, probable that the deceased, at the distance she must have been from the prisoner when she stopped, could have seen a small knife in her hands? We think not. *
3. The stick which the deceased carried with her was found near the path of the prisoner, as also one of her shoes.
4. The father of the deceased pointed out a place on the *496 path of the prisoner, where he said his daughter had been killed, and a leaf with a drop of blood on it was there found; and this immediately after the homicide.
5. The prisoner had a severe contusion on her head, and one on her wrist; these blows must have been given before the parties clinched, and before the deceased was stabbed. All these things tend to show most satisfactorily, that the deceased did not stop until she arrived at the point of the intersection of the two paths, where she awaited the arrival of the prisoner — and that the prisoner at the distance of twenty steps paused, not knowing certainly whether to advance or recede, but eventually concluded to advance and risk the consequences, with the determination to protect herself by slaying her adversary,, if necessary — and that her adversary commenced the assault by striking her with the stick.
But then there is the testimony of Ferdinand Dougherty and Alexander Farris, which states that the deceased did stop five steps short of the prisoner’s path, and that the prisoner did make the assault.
We think, these witnesses are mistaken, because,
1st. The distance from the place where they stood, and the place where the rencontre took place was too great for them to judge with accuracy whether the deceased stopped short of the intersection of. the path or not.
2d; It is obvious that they did not see the commencement of the affray, no one can doubt, that the deceased struck the prisoner at least two blows with the stick before they closed, when deceased probably discovering the knife in the hands of the*prisoner, dropped her stick with the view of taking the knife from her; this was the time the grabbing of hands spoken of by the witnesses, took place. Yet Ferdinand Dougherty says, the deceased had no stick: and Alexander Farris, says, that although the deceased started with a stick; yet when he first saw the struggle, which he describes, as a grabbing of hands, fie saw no stick, and that he did not know, what the deceased did with the stick, she took from the crib.
3d. Samuel Farris, who also witnessed the fight, from the same place, with the other two witnesses, says, that the de *497 ceased and prisoner met between the junction of the two paths —that they both képt on and met.
4th. Thompson Cash says, that on the same day, the homicide was perpetrated, Alexander Farris told him that his aunt Ruth went out, and commenced upon the prisoner with a stick, and that prisoner had killed her.
These reasons satisfy us, that the witnesses, Ferdinand Dougherty, and Alexander Farris, did not, as we have said, see the commencement of the fight, and that they are mistaken in supposing that the deceased stopped five steps short of the intersection of the paths, and that the prisoner brought on the attack.
This then being so, we are fairly warranted in saying, that the deceased went upon the path of the prisoner, with a determination to inflict severe punishment upon her, that she stopped at the point of intersection, and awaited her coming — that tho prisoner kept on her way, determined to resist, and protect herself, be the consequences what they might.- That the deceased commenced the combat, and that the prisoner killed her. This is not murder in the first or second degree, and must be homicide, in self defence, or at most, manslaughter.
We therefore,' reverse the judgment of the Circuit Court, and give the prisoner a new trial.